NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250505-U

NO. 4-25-0505

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 3, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| JESSICA LIGHTHART, | ) | No. 02CF3683 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Scott Paccagnini, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court
Presiding Justice Steigmann and Justice Vancil concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Defendant received reasonable assistance of postconviction counsel, and the circuit
court did not err in denying defendant's sentencing claim at the second stage.

¶ 2     Defendant Jessica Lighthart appeals from the denial of her postconviction petition
following a third-stage evidentiary hearing. Defendant argues that (1) postconviction counsel
provided unreasonable assistance in alleging and arguing prejudice as it relates to plea counsel's
failure to file a motion to withdraw the guilty plea, (2) the circuit court erred in dismissing at the
second stage the claim that plea counsel was ineffective for failing to present additional evidence
in mitigation at sentencing, and (3) postconviction counsel rendered unreasonable assistance by
failing to attach additional witness affidavits to the petition to support the claim that plea counsel
was ineffective in arguing mitigation at sentencing. For the reasons that follow, we affirm.

¶ 3                                        I. BACKGROUND

¶ 4     Defendant was charged in a 15-count indictment with, among other things, multiple

counts of first degree murder based on the shooting death of the victim by Markus Buchanan, defendant's paramour. The murder charges included counts for felony murder because the killing occurred during an armed robbery and intentional murder (730 ILCS 5/5-8-1(a)(1)(c) (West 2002)). The intentional murder and felony murder charges included an enhancement for exceptionally brutal or heinous behavior indicative of wanton cruelty, carrying the possibility of a life sentence. 730 ILCS 5/5-5-3.2(b)(2) (West 2002). The charges asserted that defendant killed the victim (1) by injecting him with drain cleaner; (2) shooting him with the intent to kill; or (3) during the commission of an armed robbery.

¶ 5                                            A. Guilty Plea

¶ 6            In 2004, defendant entered a partially negotiated guilty plea to one count of felony murder premised on attempted armed robbery in exchange for the dismissal of all other charges and a sentencing cap of 35 years' imprisonment. At the hearing, plea counsel made explicit the reason defendant chose to take the plea was because she "elected to not take the chance that she would be found guilty of a count in the Bill of Indictment that could result in a natural life sentence." Defendant was thoroughly admonished regarding her right to proceed to trial, and the sentencing court went to great lengths to ensure that her plea was knowing and voluntary.

"THE COURT: Do you have a clear head today, understand what you are doing?

THE DEFENDANT: Yes.

THE COURT: Could you tell me then in your own words what you are doing? What are the terms of this plea agreement?

THE DEFENDANT: Pleading guilty.

THE COURT: To what?

THE DEFENDANT: To first degree felony murder.

THE COURT: What are the terms of the agreement? What's going to happen after you plead guilty?

THE DEFENDANT: I get a sentencing date.

THE COURT: That's right. At the sentencing date what are the possibilities that could happen?

THE DEFENDANT: I could get a sentence from 20 to 35 years.

THE COURT: That's right. In the Departments of Corrections [(DOC)]?

THE DEFENDANT: Yes.

THE COURT: All right. In fact, what the terms of this agreement are, is that you would in fact plead guilty to Count 1 of the Bill of Indictment. The other counts in this Bill of Indictment against you would be dismissed pursuant to that plea. This case would then be set for sentencing hearing.

At the sentencing hearing the State could present evidence as well as you and your counsels could present evidence. The Court will consider all that I must consider and then enter a decision about this case. Without the cap of 35 years the maximum sentence that you could have received on Count 1 alone would have been 60 years in the [DOC]. The minimum is unchanged, 20 years in the [DOC]. ***

*** The sentence range in Count 1 is 20 to 60 years. Because of the cap the sentencing range then on Count 1 would be 20 to 35 years in the [DOC]. Do you understand that?

* * *

THE DEFENDANT: Yes.

* * *

THE COURT: At the sentencing hearing the State may in fact try to introduce evidence that may go to some of the counts that were in fact dismissed. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Okay. Of course, you have a right to be present, the right to present witnesses, and the right to cross examine witnesses through your counsel. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: If at the sentencing hearing the Court gives you a sentence that's within this agreement, that means within the sentencing range of 20 to 35 years, then you will not be allowed to withdraw your plea of guilty simply because you don't like the sentence. Do you understand that?

THE DEFENDANT: Yes.

* * *

THE COURT: Have you gone through the possible penalty range before, without the plea agreement and with the plea agreement? Do you have any questions regarding the sentencing range available to the Court?

THE DEFENDANT: No.

THE COURT: Have you had an opportunity to talk about this case, the other charges, and what you would like to do with respect to these matters with your attorneys?

THE DEFENDANT: Yes.

- 4 -

THE COURT: Do you need any additional time to speak to them before we proceed here today?

THE DEFENDANT: No.

THE COURT: Are you satisfied with their representation?

THE DEFENDANT: Yes.

THE COURT: Miss Lighthart, do you understand that you have the absolute right to plead not guilty to this charge, and to persist in your plea of not guilty? Do you understand that?

THE DEFENDANT: Yes.

THE COURT: You have a right to have a trial either before a Judge or jury. You know what a jury trial is?

THE DEFENDANT: Yes.

* * *

THE COURT: We will, however, have a separate sentence hearing. At that sentencing hearing the State can again present evidence, witnesses against you. You and your counsel can present evidence, witnesses in your favor, do you understand that?

THE DEFENDANT: Yes.

THE COURT: Have any promises been made to you in order to get you to enter into this plea of guilty here today, to Count l of the Bill of Indictment, other than the agreement that there would be a cap on this charge of 35 years in the [DOC]?

THE DEFENDANT: No, ma'am.

THE COURT: Are you entering this plea of your own free will?

THE DEFENDANT: Yes.

THE COURT: Do you have any questions about any aspect of this plea?

THE DEFENDANT: No."

¶ 7    The factual basis for the plea was as follows. Defendant was 23 years old at the time of the plea and was periodically in a dating relationship with both the victim and Buchanan around the time of the offense. The victim was known to have access to large amounts of money, and she and Buchanan intended to rob him. Defendant drove the victim to a house owned by Nicole DiMaggio, where she knew Buchanan lay in wait. She had the victim carry a cooler into the house so his hands would be occupied, thus restricting his ability to defend himself. Buchanan confronted the victim with a handgun and proceeded to physically beat him while demanding money. Eventually, Buchanan shot the victim. Before dying from the gunshot wound, defendant "either did in fact or attempted to inject [the victim] with a solution that contained Drano." Buchanan and a friend of DiMaggio who was visiting at the time, Michael Lidster, went to purchase gasoline, while defendant and DiMaggio cleaned up the blood and "patched *** bullet holes." All four wrapped the victim's body and placed it in a Jeep that was driven to a rural field and set ablaze. Defendant and Buchanan fled to the state of Georgia.

¶ 8    Plea counsel objected to the part of the factual basis asserting that defendant had injected the victim with Drano, but counsel acknowledged that the State would be able to produce witnesses to testify to that effect.

¶ 9    Defendant once again confirmed that she was pleading guilty of her "own free will" and understood what she was doing. The sentencing court accepted the factual basis as well as the

plea and agreed to be bound by the 35-year sentencing cap. Prior to defendant's sentencing hearing, Buchanan was separately tried and convicted of first degree murder at a bench trial.

¶ 10                                    B. Buchanan's Bench Trial

¶ 11        We provide a brief overview of Buchanan's trial below because the parties asked the sentencing court to take judicial notice of the testimony and evidence provided there.

¶ 12        In return for waiving a jury trial, Buchanan received a 50-year sentencing cap. On the day of trial, the State dismissed the intentional murder charges and proceeded on two counts of felony murder. Relevant to this appeal, Rocco Wagner testified that he was an investigator for the Winnebago County Sheriff's Office and that he interviewed Buchanan after he was detained by federal agents. Buchanan had given statements that were read into the record. Buchanan stated that it was defendant's idea to rob the victim. Defendant called Buchanan on the day of the offense and told him that the victim was picking her up, and Buchanan told her he was going to be at DiMaggio's house. Defendant had the victim carry something into the house; he brought the item to the kitchen, where Buchanan confronted him. Defendant had told Buchanan that the victim carried drugs, money, and a pistol, and she suggested robbing him of his money. At some point, the victim "rushed" Buchanan and in the process was shot twice. After that, DiMaggio injected the victim with Drano in the arm and the neck.

¶ 13        DiMaggio testified under a cooperation agreement with the State. She stated that defendant brought the victim to her house, where Buchanan was waiting for him. Once the victim came into the house and put down what he was carrying, Buchanan emerged from the kitchen, pointing a gun and demanding money and cocaine. She eventually heard a "scuffle," followed by three gunshots. Buchanan and defendant then forced DiMaggio and Lidster to sit in the living room and asked for suggestions to "kill *** off" the victim. DiMaggio believed that Buchanan was going

- 7 -

to shoot her and Lidster and suggested poison and Drano to make Buchanan think she was on his side. After she suggested injecting the victim with Drano, Buchanan told her to "go do it."

¶ 14        Once all the materials were collected, DiMaggio refused to fill the syringe with Drano, but she eventually tried to do so without success. Buchanan then mixed the Drano with water and then directed DiMaggio to fill the syringe with the solution. Defendant kept telling DiMaggio to inject the victim. DiMaggio grabbed the victim's right arm, and it was cold to the touch. She inserted the needle under the skin but did not push the plunger on the syringe. DiMaggio then pulled the syringe out, put the cap over the needle, and told Buchanan she would not inject the victim. Defendant then grabbed the syringe off the table, pushed DiMaggio out of the way, removed the cap, stuck the needle into the victim's neck, and pushed down the plunger on the syringe. Approximately 20 minutes later, the victim stopped breathing. DiMaggio never called the police because she believed Buchanan's threat that he would kill her if she did.

¶ 15        A forensic pathologist testified that the victim died from the gunshot wounds.

¶ 16        Buchanan was convicted on two counts of first degree felony murder and sentenced to 50 years' imprisonment.

¶ 17                          C. Sentencing

¶ 18        The current matter proceeded to sentencing. Relevant on appeal, defendant presented two witnesses, her mother Dawn Shoeneck and her cousin Amber Kellaney. Generally, they testified that Buchanan had abused, stalked, and isolated defendant over the two years preceding the murder. Plea counsel introduced a photo into evidence depicting substantial bruising of defendant's face following an incident of abuse from Buchanan. In addition to general facial bruising, defendant had two black eyes, with the bruising to her left eye covering the majority of the orbital socket.

¶ 19 Kellaney stated that there was an incident where Buchanan "pistol-whipped" defendant, leaving injuries to her face. She also witnessed Buchanan push and hit defendant in the face on another occasion. Moreover, Buchanan lived with defendant, Kellaney's mother, and Kellaney at one point in time. She knew him to carry a handgun. Buchanan threatened Kellaney and members of her extended family with physical violence.

¶ 20 Schoeneck testified that Buchanan would stalk defendant while she was at the house visiting with family. He would watch the house from a vehicle down the street. He would call the house repeatedly to talk to defendant and demand that she leave. Defendant would tell Schoeneck, " 'Mom, I gotta go so nothing will happen.' " Schoeneck saw bruising and marking on defendant and was told it was from arguments with Buchanan. She also described how defendant stated that she was "pistol-whipped" by Buchanan and the injuries sustained. Schoeneck believed that at one point defendant had an order of protection against Buchanan.

¶ 21 Both Kellaney and Schoeneck identified defendant in the photograph that depicted her with abnormal facial bruising. They stated that they had witnessed those injuries and others during defendant's relationship with Buchanan.

¶ 22 Plea counsel also attempted to call defendant's minor son to the stand. The sentencing court asked the child if he knew "the difference between telling a lie and telling the truth," and the child answered, "No." The court ruled the minor would not be allowed to testify because of his inability to distinguish between a lie and the truth.

¶ 23 When defense counsel indicated that she did not intend to call any other witnesses, the sentencing court turned to defendant to determine whether she wished to testify. Defendant stated that she did not. The court then admonished defendant that she had the right to testify and it was her choice. Further, the court questioned whether defendant had been threatened or promised

anything in return for not testifying and whether defense counsel had told her that she could not testify. Defendant stated no and acknowledged she was making the decision not to testify freely and voluntarily.

¶ 24　　In a statement of facts submitted to the sentencing court by the State, it was alleged that when DiMaggio refused to inject the victim with Drano, defendant grabbed the syringe out of her hand, "plunged the needle into the victim's neck," and pushed down the plunger in the syringe, emptying the Drano into the victim. Accompanied by DiMaggio, defendant drove the Jeep carrying the victim's body to a farm field where they soaked the vehicle in gasoline and set it on fire. When defendant was eventually arrested, she provided three statements to police, detailing her involvement in the murder. Those inculpatory statements were the subject of an abandoned motion to suppress (and subsequently attached to a State's motion to dismiss during postconviction proceedings).

¶ 25　　In allocution, defendant stated that "for the last two-and-a half years ," she had been "under the shadow of [Buchanan]" and regretted what had happened and how her fear kept her from acting responsibly. She spent the majority of her relationship with Buchanan in "fear of [her] own life."

¶ 26　　Plea counsel referenced the picture of defendant with a badly bruised face following abuse from Buchanan and asked the sentencing court to take judicial notice of the testimony at Buchanan's bench trial. The State agreed that judicial notice was appropriate. Counsel argued that defendant feared for her life during the incident, an assertion supported by DiMaggio's testimony. Counsel asked the court to consider in mitigation that defendant's conduct was compelled by someone else. Counsel requested that the court impose the minimum sentence.

¶ 27　　The State asked for the maximum 35-year sentence, noting defendant's significant

criminal history. The State argued that, although defendant was in an abusive relationship, she had opportunities to stop the series of events or to escape but never did. But for defendant's actions, the victim would never have been murdered. Defendant aided in covering up the crime and plunged a syringe containing Drano into the victim's neck. Furthermore, the evidence from Buchanan's trial showed that defendant was a willing participant.

¶ 28 The sentencing court took a brief recess and then issued defendant's sentence from the bench. The court found that this incident was a tragedy for both the victim's family and defendant's. However, unlike the victim, defendant "participated in the destruction of her life." The court recounted defendant's criminal history and the opportunities of which she failed to take advantage to change her life. The court further stated that it accepted "the testimony that you've been the victim of violence at [Buchanan's] hands and that seems to be clear. However the relationship is complex, and it's very difficult for the Court to get a feel for all the dimensions of this relationship." The court further found:

> "Part of the testimony that I heard was [Buchanan] was leaving to move down to Atlanta with some other woman, and at one point in your relationship you were having a relationship with another individual too. So while there certainly appears to have been force as part of your relationship and a degree of violence, at some point in time you were not in a relationship with him and started up a relationship with [the victim].
>
> Because it is clear, and it has been stated, but for you this never would have happened as it did. But you bringing *** [the victim] over to the residence, he wouldn't have been there. It was you who brought him over to the residence that fateful night, and it was you who brought him over to the residence for the purpose

of conducting this robbery. It was you that made sure his hands were full of a heavy object so that [Buchanan] could get the jump on him with the gun. *** Buchanan wasn't there then.

*\*\**

Yes, you didn't pull the trigger, but you did set up this offense. *** And then, after he was fatally shot, you took the syringe, when you and the others were talking about how you could kill [the victim] off, how you could make sure he was truly dead, you took the syringe and plunged it into his neck. You did that.

* * *

I certainly do not find that you acted under strong provocation. Even though you have presented evidence of [Buchanan's] violent nature, I do not find that this violent nature was in a level of strong provocation to justify or excuse your behavior in any way. *** In fact, according to your witnesses, you had an order of protection at one time. Whether that's true or not, you certainly had the capacity to put yourself in a safe position and to put your family in a safe position without participating in the murder of [the victim]. You chose not to take that route, and for that you'll be forever responsible.

I do not find that you acted under strong provocation. I do not find there are substantial grounds tending to excuse or justify your criminal conduct although failing to establish a defense.

I do not find that your criminal conduct was induced or facilitated by someone other than yourself. Even though your testimony, the testimony that I've heard has been, as I've stated, regarding the violent nature of your relationship with

[Buchanan], I do not find that that is a factor in this particular incident. In fact, it appears that it's your information regarding [the victim] carrying around money and cocaine that you relayed to [Buchanan] that that facilitated or induced this offense."

¶ 29 After commenting that the offense "was a pretty cold, calculated crime," the sentencing court imposed the maximum sentence of 35 years' imprisonment. The court then admonished defendant that if she wanted to appeal, she had to file a motion to withdraw her guilty plea within 30 days and that, if such a motion was granted, the State could then reinstate all previously dismissed charges. A failure to file the motion within the time provided would result in the loss of her right to appeal. Defendant stated that she understood.

¶ 30 D. Postjudgment Motions

¶ 31 Defense counsel immediately filed a motion to reconsider defendant's sentence, arguing that imposing the maximum sentence under the agreed cap was excessive. The sentencing court denied the motion.

¶ 32 Defendant then filed an untimely *pro se* motion to withdraw her guilty plea. Following amendment, the pleading alleged ineffective assistance of plea counsel for, among other things, failing to develop the compulsion defense based on the abuse by Buchanan. Although the motion was untimely, the matter proceeded to a hearing. At that hearing, defendant acknowledged that she agreed to a plea deal capped at 35 years of incarceration in lieu of facing charges that could have carried a sentence of natural life imprisonment. Nonetheless, she wanted plea counsel to pursue a compulsion defense because of the severe and almost daily abuse she suffered at the hands of Buchanan. Counsel "looked into a few things" and retained an expert witness, who interviewed defendant. However, following the interview, counsel informed her "it wasn't going

- 13 -

to do any good and that there wasn't nothing he could do." Essentially, defendant testified that counsel failed to sufficiently argue the compulsion factor in mitigation at sentencing and that she felt pressured into pleading guilty because counsel failed to pursue the compulsion defense. Defendant stated that Buchanan used to "beat [her] severely every day nonstop and force [her] into doing a lot of things" that she never would have done. At the time of the offenses in question, Buchanan held a gun against her head and made her "do a lot of stuff." When pressed on that assertion, she clarified that it did not have anything to do with the victim but rather during the removal of the body and cleanup of the scene "everybody was being held at gunpoint."

¶ 33        In relation to the plea deal, defendant testified that plea counsel informed her that although the sentencing range for the guilty plea was 20 to 35 years, defendant would receive the minimum 20 year sentence. Defendant acknowledged her answers to the thorough admonishments by the sentencing court during the plea hearing but maintained she answered that way because plea counsel had told her she was going to get the minimum sentence. After receiving the maximum sentence, defendant asked counsel, "[W]hat just happened?" and counsel stated she would talk to her in a minute, " 'that was not supposed to happen.' "

¶ 34        Plea counsel, Kristine Peshek, testified. She and defendant had discussed a defense of compulsion regarding the abuse from Buchanan. Peshek hired an expert witness to interview defendant in order to corroborate the compulsion defense. However, the testimony of the expert regarding the defense was "ambivalent." While "[t]here were some things that could have been helpful," there were "other things that definitely would not have been helpful." Had the case gone to trial, Peshek may have opted to forgo the expert testimony and instead call witnesses who observed domestic violence between defendant and Buchanan.

¶ 35        Peshek had discussed the compulsion defense with defendant and reviewed the

report from the retained expert with her. Relating to plea deals, Peshek "consistently told [defendant] it was her decision whether she wanted to go to trial or not and we would go along with what her decision would be, but we also gave her our advice as attorneys as to what we thought would be in her best interests." She discussed the State's offers with defendant, explaining that the offer for 27 years' imprisonment was a "definite disposition," while the "cap" left open a range of penalties to be imposed by the circuit court.

¶ 36 The day before the plea hearing, Peshek and another defense attorney, Shelton Green, met with defendant at the jail for about an hour and again in her holding cell immediately before the hearing to go over the plea details and ensure defendant understood what she was doing. Peshek denied ever telling defendant the plea deal was for a definite term of 20 years, that she was going to get the minimum, or that after sentencing "that was not supposed to happen." After defendant was sentenced, Peshek discussed filing the motion to reconsider the sentence with defendant.

¶ 37 The circuit court summarized the issues presented as whether defendant was compelled to plead guilty because defense counsel had failed to investigate the compulsion defense and whether counsel promised defendant she would receive the minimum 20-year sentence. The court did not find defendant's testimony credible and found that counsel had investigated the compulsion defense and discussed it with her. Moreover, counsel's advice to defendant about the nature of the plea was consistent with the court's admonishments at the plea hearing. While it was "clear [defendant] doesn't like the sentence," counsel was not ineffective, so defendant's motion to withdraw her guilty plea was denied.

¶ 38 E. Attempt at Direct Appeal

¶ 39 Defendant pursued a direct appeal, but it was dismissed for lack of jurisdiction due

- 15 -

to the untimely motion to withdraw the guilty plea. *People v. Lighthart*, 367 Ill. App. 3d 1103 (2006) (table) (unpublished order under Illinois Supreme Court Rule 23); see Ill S. Ct. R. 604(d) (eff. Dec. 13, 2005) ("No appeal shall be taken upon a negotiated plea of guilty challenging the sentence as excessive unless the defendant, within 30 days of the imposition of sentence, files a motion to withdraw the plea of guilty and vacate the judgment."). No petition for leave to appeal was filed with the Illinois Supreme Court.

¶ 40                           F. Postconviction Proceedings

¶ 41            In 2007, defendant filed a *pro se* postconviction petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2006)). She alleged ineffective assistance of counsel based on (1) a failure to investigate a compulsion defense grounded in the occurrences of domestic violence, (2) a deficiency during the negotiation of her guilty plea, and (3) the loss of her direct appeal rights.

¶ 42            The circuit court dismissed the petition at the first stage as frivolous and patently without merit, but the appellate court found the gist of a constitutional claim had been alleged and reversed the dismissal. *People v. Lighthart*, 391 Ill. App. 3d 1129 (2009) (table) (unpublished order under Illinois Supreme Court Rule 23). The matter was remanded and defendant was appointed counsel.

¶ 43            There was then an "inexcusable and unconscionable 11½-year delay in the second stage proceedings following that initial appointment of counsel." *People v. Lighthart*, 2023 IL 128398, ¶ 23. Following the appointment of two different attorneys and defendant hiring private counsel, in 2020, a supplement to the amended postconviction petition was filed and refined the same arguments made in the earlier petition.

¶ 44            The State filed a motion to dismiss, arguing that the petition was untimely because

defendant did not appeal the dismissal of her direct appeal and did not file the postconviction petition within six months of the date to appeal the dismissal. See 725 ILCS 5/122-1(c) (West 2006). The circuit court agreed and dismissed the petition in April 2021.

¶ 45 On appeal, the appellate court affirmed the circuit court's judgment. *People v. Lighthart*, 2022 IL App (2d) 210197, ¶ 51.

¶ 46 The Illinois Supreme Court reversed. *Lighthart*, 2023 IL 128398, ¶ 80. The court found that while, pursuant to section 122-1(c), defendant's petition was untimely, "under the unique circumstances presented in this case, [defendant] could not have been culpably negligent in failing to file her petition within that six-month period," and thus, the dismissal of the circuit court was reversed and the matter was remanded with instructions that defendant be allowed to amend the petition to plead "her lack of culpable negligence." *Id.* ¶ 79.

¶ 47 1. *Second-Stage Proceedings Following Remand*

¶ 48 On remand, an amended supplemental petition was filed, alleging, among other things, that plea counsel was ineffective for failing to interview and investigate available witnesses whose testimony would have supported the compulsion defense and for failing to file the appropriate postjudgment motion to preserve defendant's direct appeal rights. Defendant alleged that her lack of culpable negligence in belatedly filing the petition, and that subject is not at issue in this appeal. Attached to the petition was the affidavit of Nicole Floyd, attesting that Buchanan was her cousin and defendant was her best friend. She knew Buchanan to be a violent person and witnessed bruising on defendant's face and saw Buchanan strike her. Buchanan stalked defendant, who was afraid Buchanan would follow through on the threats he had made against her family. When Floyd saw Buchanan strike defendant, she tried to intervene, and Buchanan attempted to choke her. Floyd did not believe defendant would have set up the robbery of the victim. Floyd

spoke to police after the murder but was never contacted or interviewed by plea counsel or her investigator, although she was available as a witness.

¶ 49       The State renewed its motion to dismiss and attached the interview reports of plea counsel's investigator showing that nine witnesses had been interviewed in relation to the compulsion defense: Amy Kellaney, Sandy Kellaney, Reynold Lighthart, Brendon Lighthart, Janet Lighthart, Lori Lighthart, Willie Lighthart, Dawn Schoeneck, and Amber Kellaney. Generally, all the reports depict the violent nature of the relationship between defendant and Buchanan, with the witnesses recounting bruising and incidents of violence ranging from a "pistol-whipping" to choking and striking defendant. Lori described an incident where she drove to get defendant because Buchanan had beaten her and locked her outside with no shoes or keys after breaking all of her car windows. The witnesses all stated that when they attempted to get defendant to leave Buchanan or call police, she refused based on his threats and her fear that he would follow through on them. The motion was later supplemented with the attached statements to police from defendant, Buchanan, DiMaggio, and Lidster.

¶ 50                      2. *Operative Postconviction Petition*

¶ 51       Following the State's motion to dismiss, postconviction counsel filed an amended supplemental postconviction petition. This petition incorporated the claims made in the *pro se* petition filed in 2007 and the amended petition in 2018. In total, defendant advanced seven claims that plea counsel was ineffective in the following respects: (1) failing to investigate the use of a compulsion defense at trial; (2) failing to investigate and interview witnesses regarding abuse defendant suffered from Buchanan; (3) spending inadequate time with defendant reviewing case materials prior to sentencing, (4) failing to review the presentence investigation report and statement of facts with defendant prior to sentencing, (5) not introducing additional evidence of

domestic abuse at sentencing, (6) advising defendant to turn down a plea deal of 27 years' imprisonment, and (7) failing to file a motion to withdraw the guilty plea. Regarding the claim that plea counsel should have introduced additional evidence of domestic abuse at sentencing, defendant pointed to her own affidavit and that of Nicole Floyd as additional support for the mitigating factor outlined in section 5-5-3.1(a)(15) of the Unified Code of Corrections (Code) (730 ILCS 5/5-5-3.1(a)(15) (West 2016)) (domestic violence). Regarding the claim that plea counsel failed to investigate and interview witnesses to establish the compulsion defense, she attached the affidavits of Floyd, William Lighthart, and Lori Lighthart, and she also referenced her own affidavits. All described the abusive relationship between defendant and Buchanan.

¶ 52                                  3. *Circuit Court's Order—Second Stage*

¶ 53        Following second-stage proceedings, the circuit court dismissed certain claims while advancing others to a third-stage evidentiary hearing. Relevant on appeal, the court found the claims that counsel was ineffective for failing to file a motion to withdraw the guilty plea and that counsel failed to adequately investigate and interview witnesses regarding domestic abuse suffered by defendant were sufficient to move to the third stage. The court found that the claim that plea counsel failed to investigate the compulsion defense was waived by the guilty plea.

¶ 54        The circuit court also dismissed the claim that plea counsel was ineffective for failing to submit additional evidence at sentencing showing that defendant suffered domestic abuse by Buchanan. The court reiterated statements from the sentencing court that showed it had accepted defendant was the victim of domestic violence and that, but for her actions, the victim would not have been lured to his death. The court found that additional evidence or testimony on the topic of domestic violence would not have changed the outcome, so plea counsel was not objectively unreasonable for failing to present additional witness testimony on that subject. The

court noted that it was barred by the framework of the Act from considering the interviews attached to the State's motion to dismiss because they did not otherwise appear in the record. See *People v. Overton*, 2023 IL App (4th) 230110, ¶ 64 (noting that the State cannot support a motion to dismiss with material not contained in the record). However, the evidence would be considered at the third stage.

¶ 55                                    4. *Third-Stage Proceedings*

¶ 56        The matter proceeded to the third stage, where defendant testified that she had told plea counsel that Floyd had witnessed "a lot of the abuse" inflicted on her by Buchanan. She said that, after she received her sentence, she immediately leaned across the table and told plea counsel that she wanted to appeal. Defendant acknowledged her answers to the sentencing court during the guilty plea admonishments. Defendant also acknowledged she was asked and similarly responded to questions about her plea admonishments at the hearing on the motion to withdraw her guilty plea. During the questioning on this topic, the following transpired.

"Q. [(ASSISTANT STATE'S ATTORNEY:)] The judge asked you if your plea was of your own free will, correct?

A. [(DEFENDANT:)] Yes.

Q. And you responded yes.

A. Yes.

Q. And you said that the reason you responded that way was because you were thinking you were going to get 20 years, correct?

A. Yeah.

Q. So if you'd gotten the minimum sentence, your plea would have been freely of your own free will, correct?

A. Yeah, I guess."

¶ 57 Nicole Floyd testified, and her testimony was consistent with her affidavit.

¶ 58 Bradley Stallings testified that he was the defense investigator in defendant's case and had prepared reports that summarized interviews of, among others, Lori and William Lighthart. He reviewed all nine interviews that had been attached to the State's motion to dismiss and stated that he conducted those interviews at the request of plea counsel. The content of the interviews revolved around the relationship between defendant and Buchanan. He reviewed a State's witness list and noted that Floyd was listed as a witness with two possible addresses. He noted that, at the time the trial was conducted, it was usually more difficult to find such a witness, as multiple addresses often meant that the witness was frequently on the move and that the listed addresses were not valid. He had no personal recollection of being asked to interview Floyd, and approximately a year prior, he had destroyed all records from the case that would have noted whether he was looking for Floyd. At the time of the third-stage hearing, the records would have been over 20 years old. He had worked with plea counsel on "[d]ozens" of cases and often attended client interviews, and he never heard her promise a specific sentence or a specific result during any of those meetings.

¶ 59 Shelton Green previously worked as a felony trial attorney for the Winnebago County Public Defender's Office and worked on defendant's case. He would never tell a defendant that they were not permitted to take a plea deal. He did not remember plea counsel having a conversation with defendant telling her not to take a plea deal. He also did not remember ever telling defendant that she would receive the minimum sentence in the agreed-to range and stated that he did not think it would ever be appropriate to tell a defendant that. When reviewing defendant's case file, he found a piece of paper with a list of witnesses on it that contained a note,

"Nicole Floyd—if can find." He was not involved in the preparation of postjudgment motions.

¶ 60 Peshek testified and identified supplemental answers to the State's motion for disclosure that revealed her intention to pursue a compulsion defense should the matter have proceeded to trial. She had retained an expert witness to corroborate the affirmative defense, but the expert's findings were that although defendant "had been through considerable abuse in her relationship," she was not completely under his dominion, as "she was free to leave and go hang out with friends or do other things." Peshek stated the expert opinion had both good and bad findings in relation to the compulsion defense. Peshek had also developed numerous lay witnesses in support of the compulsion defense. Additional supplemental disclosures showed that the defense intended to call Dr. Kirk Witherspoon as an expert witness and listed an additional 10 lay witnesses. The lay witnesses would have all been offered to support the compulsion defense.

¶ 61 Peshek had asked Stallings to locate Floyd because it seemed that she had information about defendant's relationship with Buchanan and the victim. Stallings could not find Floyd. Had Floyd testified consistently with her affidavit, the testimony would have some impact on the compulsion defense, but the proposed testimony "was largely cumulative of what the other witnesses would say."

¶ 62 Peshek had discussed the strengths and weaknesses of defendant's case with her, including the compulsion defense and its viability. A weakness of the compulsion defense was that it did not apply to the intentional murder charges defendant was facing and may not have applied at all because of the active role defendant played in the victim's death. Peshek never told defendant she was not allowed to accept a guilty plea, and defendant later accepted a plea with a cap of 35 years. When asked whether the plea was actually an agreement that defendant would receive the bare minimum 20-year sentence, Peshek stated, "Why would I do that? If I had [a] guarantee that

she was going to get 20 years, I would have marched her in here in front of Judge Collins and pled for 20 years." Peshek never promised defendant she would get the minimum, only that she would argue for it. Defendant and Peshek had met before the plea hearing to discuss the nature of the plea and the questions the judge would ask at the hearing.

¶ 63 After sentencing, defendant was furious. Peshek could not recall discussing a motion to withdraw the guilty plea with defendant. If defendant wanted to challenge the sentence without vacating the plea, a motion to reconsider the sentence would have been appropriate. She would not have filed the motion to reconsider the sentence unless she was asked to do so. While Peshek could not recall postjudgment discussions regarding what motion to file, she did not see a basis to withdraw the guilty plea because

"Judge Collins did a prolonged and detailed plea colloquy with [defendant] where she had her explain in her own words what she thought was going to be happening here, what she thought she was going to get, did she understand the charges, did she understand her rights, and [defendant] agreed to each of the questions that Judge Collins asked her. It was one of the more extended plea colloquies I've ever attended in Illinois."

¶ 64 On cross-examination, Peshek clarified that she never interviewed Floyd because they could not locate her. She could not recall if defendant asked her to appeal the sentence but, as a matter of course, she normally appealed "in all murder cases anyway." When asked if she filed the wrong postjudgment motion, Peshek stated that "the usual reason why I would file a reconsideration motion was at the defendant's request."

¶ 65 During argument, postconviction counsel asserted that defendant had established prejudice because she was deprived of her right to a direct appeal, citing *People v. Thomas*, 292

Ill. App. 3d 891 (1997), and *People v. Ross*, 229 Ill. 2d 255 (2008). Regarding Floyd's testimony, counsel argued that her testimony would have carried more weight since she was not a family member of defendant and instead was related to Buchanan.

¶ 66                                    5. *Circuit Court Order—Third Stage*

¶ 67          Following argument from counsel, the circuit court took the matter under advisement and issued a 37-page written opinion and order denying defendant relief. The court found that defendant had failed to make a substantial showing of a constitutional violation as it related to counsel filing a motion to reconsider sentence instead of a motion to withdraw the guilty plea. The court found that defendant's claim regarding her directive to plea counsel to appeal had "evolved over time." The court then summarized the pleadings and testimony at the various hearings, noting that the claim had evolved from counsel failing to file the motion to withdraw her plea as requested, to counsel failing to inform defendant of her right to file a motion to withdraw and file a Rule 604(d) certificate, to defendant leaning over and telling counsel immediately after learning of her sentence that she wanted to appeal.

¶ 68          The circuit court found that defendant could not establish prejudice because she did not allege a valid basis to withdraw her guilty plea. The court stated that this was "not surprising" in light of (1) the meticulous plea hearing admonishments, (2) the clear evidence of defendant's guilt, and (3) the lack of a meritorious defense. The court concluded that the ends of justice would not be better served by holding a trial. The court noted that the compulsion defense would not have applied to the intentional murder charges and that, without the plea, defendant would have been at risk of being sentenced to a term of natural life imprisonment.

¶ 69          Moreover, defendant was aware of the compulsion defense at the time of the plea, as she and plea counsel had discussed it extensively, but she did not want to take the chance with

a jury trial that could result in a natural life sentence. The circuit court found that "defendant clearly is upset that she got the maximum sentence under the agreement, which is why *** Peshek filed a motion to reconsider the defendant's sentence."

¶ 70       This appeal followed.

¶ 71                              II. ANALYSIS

¶ 72       Defendant presents multiple contentions of error on appeal. She argues that postconviction counsel provided unreasonable assistance for failing to make necessary amendments to the postconviction petition to establish prejudice based on the failure of plea counsel to file a motion to withdraw the guilty plea. Although this claim was argued at a third-stage evidentiary hearing, defendant also seeks reversal for counsel's failure to amend the claim at the second stage. She also argues that the circuit court erred in dismissing, at the second stage, her claim that plea counsel was ineffective for failing to submit additional evidence in mitigation at sentencing related to the domestic abuse suffered at the hands of Buchanan. Alternatively, defendant argues that postconviction counsel provided unreasonable assistance in failing to attach the nine witness affidavits and an affidavit from an expert witness to adequately present the claim that plea counsel was ineffective for failing to elicit additional domestic abuse testimony in mitigation at sentencing.

¶ 73                              A. The Act

¶ 74       Under the Act, a criminal defendant can allege violations of a constitutional nature to collaterally attack a conviction. *People v. Domagala*, 2013 IL 113688, ¶ 32. Relevant here, defendant alleges ineffective assistance of plea counsel in her petition, claims that are evaluated on the merits under the familiar two-prong *Strickland* test. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The framework of the Act provides for three stages of review. *Domagala*, 2013 IL

113688, ¶ 32. Relevant here are the second and third stages.

¶ 75 At the second stage, counsel is appointed, and the State may answer or file a motion to dismiss the petition. 725 ILCS 5/122-4, 122-5 (West 2022). While there is no constitutional guarantee to effective representation during the proceedings, statute requires that counsel provide reasonable assistance at all stages. See *People v. Cotto*, 2016 IL 119006, ¶¶ 29-30, 41. To ensure reasonable representation, appointed postconviction counsel must comply with the standards set forth in Illinois Supreme Court Rule 651(c) (eff. July 1, 2017). *People v. Huff*, 2024 IL 128492, ¶ 22. Pertinent here, the rule requires that counsel make "any amendments to the petitions filed *pro se* that are necessary for an adequate presentation" of those claims. Ill. S. Ct. R. 651(c) (eff. July 1, 2017). The circuit court must ultimately determine whether the petition and the accompanying documentation establish a " "substantial showing of a constitutional violation' " at the second stage. *Domagala*, 2013 IL 113688, ¶ 33 (quoting *People v. Edwards*, 197 Ill. 2d 239, 246 (2001)).

¶ 76 At the third stage, the circuit court must determine whether the defendant established by a preponderance of the evidence that a constitutional violation occurred and thereby is entitled to relief. *People v. Harris*, 2025 IL 130351, ¶ 40.

¶ 77 B. Motion to Withdraw and the Assistance of Plea Counsel

¶ 78 1. *Standard of Review*

¶ 79 Initially, the parties debate the appropriate standard of review. Defendant argues that she is challenging the reasonableness of postconviction counsel's assistance and asserts that *de novo* review is appropriate. See *People v. Coons*, 2024 IL App (4th) 230552, ¶ 34 (noting the standard of review following a challenge to a circuit court's findings at the third stage is for manifest error, while the standard of review to assess reasonable assistance of postconviction

counsel is *de novo*). The State argues that because the matter received an evidentiary hearing, the appropriate standard of review is to determine whether manifest error occurred. Having reviewed defendant's arguments under this heading, it is apparent that she is contending postconviction counsel provided unreasonable assistance in asserting prejudice, a matter reviewed *de novo*. *Id.*

¶ 80                                    2. *Merits*

¶ 81        Entering into a guilty plea is a consequential act "that is not reversible at the defendant's whim." *People v. Reed*, 2020 IL 124940, ¶ 47. It is well established that a voluntary guilty plea "waives all nonjurisdictional defenses or defects." *People v. Horton*, 143 Ill. 2d 11, 22 (1991). Leave to withdraw a plea of guilty will not be granted where a defendant becomes dissatisfied with the plea and is appropriate only " 'as required to correct a manifest injustice.' " *Reed*, 2020 IL 124940, ¶ 47 (quoting *People v. Evans*, 174 Ill. 2d 320, 326 (1996)). "[A] defendant must establish a manifest injustice under the facts involved." *People v. Burge*, 2021 IL 125642, ¶ 37. A manifest injustice exists where a guilty plea was entered "through a misapprehension of the facts or law or where there is doubt as to the guilt of the accused and justice would be better served by conducting a trial." *Id.*

¶ 82        Prejudice in a claim for ineffective assistance of plea counsel in the guilty plea context requires that the defendant show "a reasonable probability that, absent counsel's alleged errors, the defendant would have pled not guilty and insisted on going to trial." *People v. Agee*, 2023 IL 128413, ¶ 51. To that end, our supreme court has directed that "a guilty plea defendant's claim of counsel's incompetence concerning a matter of defense strategy must be accompanied by either a claim of innocence or the articulation of a plausible defense that could have been raised at trial." *Id.* Further, under *Hill v. Lockhart*, 474 U.S. 52, 59 (1985), "the question of whether counsel's deficient representation caused the defendant to plead guilty depends in large part on

predicting whether the defendant likely would have been successful at trial." *Agee*, 2023 IL 128413, ¶ 51.

¶ 83 Defendant's contention of postconviction counsel's errors under this heading is twofold. She argues that counsel rendered unreasonable assistance at both the second and third stages by failing to properly allege and argue the prejudice prong. More specifically, she argues that she "suffer[ed] a manifest injustice, as there was significant doubt of her guilt (including a meritorious defense to certain charges against her), and justice would be better served by taking her case to trial." She asks that in the interests of judicial economy, we find that she suffered prejudice and grant her postconviction petition. We note that the parties argue over the application of Rule 651(c) at the third stage, but we find that we need not address that issue to resolve the argument presented.

¶ 84 Defendant is correct in her assertion that postconviction counsel failed to properly allege prejudice in relation to counsel's ineffectiveness for the failure to file a motion to withdraw at the second stage and then failed to put forth a viable argument on the same point at the third-stage hearing. As noted above, defendant was required to show that she would have been able to assert grounds that had a reasonable probability of success if she had filed a motion to withdraw her plea.

¶ 85 Defendant argues that postconviction counsel should have alleged that there was an affirmative defense to the majority of charges that she faced and that she would have been better served by litigating that defense at trial. She contends this argument is sufficient to establish prejudice. However, this assertion causes this court to pause and review the legal framework under which we review such claims.

¶ 86 Starting with the core concept that a guilty plea waives all nonjurisdictional defects

and defenses that preceded it (see *People v. Jones*, 2021 IL 126432, ¶ 20), the record here is clear that defendant was well aware of the defense of compulsion and discussed it at length with plea counsel. Her attorney investigated the defense, submitted it to the State as an affirmative defense to be asserted at trial, interviewed at least 10 witnesses, and retained an expert witness to corroborate it. By entering her guilty plea, defendant waived the defense, and she is now foreclosed from asserting it as a ground to withdraw her guilty plea.

¶ 87          Looking at *Agee* and a subsequent case, *People v. Williams*, 2025 IL 129718, our supreme court is clear that under *Hill*, when a defendant articulates a plausible defense, we must then determine whether there is a probability the defense would have been successful at trial.

¶ 88          In *Hill*, the Court stated that "[i]n many guilty plea cases, the 'prejudice' inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial." *Hill*, 474 U.S. at 59. Specifically, the Court then opined, "where the alleged error of counsel *is a failure to advise the defendant of a potential affirmative defense to the crime charged*, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." (Emphasis added.) *Id.* This passage from *Hill* makes clear that the type of defense that is being referred to is one that was never mentioned by counsel to the defendant or conceivably, at the minimum, a defendant received advice about the defense that was outside the range of competence expected of criminal defense attorneys.

¶ 89          We note that defendant does not raise on appeal the propriety of the circuit court's second-stage dismissal of her claim that counsel inadequately *investigated* the affirmative defense of compulsion (as distinct from her separate claim, discussed below, that counsel was ineffective for not offering additional *evidence* of domestic abuse at her sentencing hearing). However, even

if a claim of inadequate investigation had advanced to the third stage, the totality of the evidence from the proceedings in this matter shows that the defense was thoroughly pursued and articulated to defendant before her plea. Therefore, defendant had no basis to claim plea counsel did not advise her of the affirmative defense of compulsion or that the advice she received from counsel as to this defense was not " 'within the range of competence demanded of attorneys in criminal cases.' " *Tollett v. Henderson*, 411 U.S. 258, 266 (1973) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)).

¶ 90  Considering the facts of this case, plea counsel's investigation of a possible compulsion defense and defendant's awareness of it *preceded* her decision to plead guilty. Having so pleaded, the existence of a possible compulsion defense—one already known to her—simply would not provide a basis to withdraw her plea. This is not a case in which plea counsel failed to investigate the defense at all prior to defendant's plea or failed to advise her of it. This is the crucial consideration in evaluating defendant's postconviction claim rooted in a claim of ineffectiveness.

¶ 91  Further, based on the facts of the case, it is dubious at best that the compulsion defense would have prevented defendant's conviction on the felony murder charges where she had an opportunity to flee or end the scheme. See *People v. Scherzer*, 179 Ill. App. 3d 624, 645-46 (1989) ("The defense of compulsion is not available to one who passes up an opportunity to withdraw from the criminal enterprise."). Moreover, the defense could not be raised against the intentional murder charges. The contention by defendant that these same charges against Buchanan were dismissed before his trial have no impact on our analysis here. We also do not find that the State's mention of the availability of a compulsion defense for DiMaggio at Buchanan's trial has any bearing on the availability of that defense for defendant, as the evidence at that trial and the record here establishes that the individual circumstances were factually distinguishable.

- 30 -

Furthermore, we disagree that justice would be better served by allowing defendant to proceed to trial where she herself decided to forgo it so that she might avoid the possibility of a natural life sentence.

¶ 92        The parties dispute the application of *People v. Rankins*, 277 Ill. App. 3d 561 (1996), to this case, but we summarily dismiss this comparison. Rather than finding that postconviction counsel provided unreasonable representation by failing to allege a viable ground for prejudice, we find that this case is analogous to the situation in *Williams*.

¶ 93        In *Williams*, the supreme court found that the appellate court had erred in incorrectly assuming that counsel had provided unreasonable assistance at the second stage where there was nothing in the record to suggest there were other grounds that postconviction counsel could have advanced. *Williams*, 2025 IL 129718, ¶ 46. The court opined that where "the record shows that under the circumstances the arguments postconviction counsel raised were the best options available, counsel cannot be said to have rendered an unreasonable level of assistance even if the arguments lacked legal merit, were not particularly compelling, and were ultimately unsuccessful." *Id.* ¶ 49.

¶ 94        Similar to *Williams*, although the argument in this case that prejudice was presumed due to the loss of defendant's direct appeal rights lacked merit, counsel was making the best arguments he could with the facts at hand. Defendant has not appealed the dismissal of the other grounds advanced in her postconviction petition to invalidate her plea, and there are no grounds apparent from the plea hearing or the rest of the record that would provide an additional basis for its invalidation. As Peshek commented, and as fully laid out in the background above, the plea hearing admonishments were meticulous. Defendant clearly articulated that she was aware of the consequences of her actions and the sentencing range she faced, and she confirmed that she was

voluntarily and knowingly pleading guilty. Even before the plea admonishments, Peshek made a record of the fact that defendant elected not to "take the chance that she would be found guilty of a count in the Bill of Indictment that could result in a natural life sentence." Defendant's subsequent testimony supports that assertion.

¶ 95        Given our conclusion that the record does not provide a viable basis for defendant to argue her plea was involuntary and unknowing, there was no basis to move to withdraw her guilty plea. Therefore, postconviction counsel did not render unreasonable assistance at either the second or third stage in alleging or arguing prejudice on this point.

¶ 96                              C. Mitigating Evidence at Sentencing

¶ 97        Defendant next argues that plea counsel at sentencing "only presented minimal evidence" of domestic abuse as a mitigating factor, and "[i]n light of the significant amount of additional evidence that could have been presented," the conclusion that the additional testimony would not have changed the outcome is "illogical." Under this heading, defendant challenges only the circuit court's finding that she failed to establish a substantial showing of a constitutional violation at the second stage. "[T]he 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle petitioner to relief." (Emphasis omitted.) *Domagala*, 2013 IL 113688, ¶ 35. All well pled facts in the petition that are not positively rebutted by the record are taken as true. *Id.* A dismissal at the second stage is reviewed *de novo*. *People v. Johnson*, 2017 IL 120310, ¶ 14.

¶ 98        Defendant's claim of ineffective assistance of counsel falls within an area recognized as trial strategy. See *People v. Cloutier*, 191 Ill. 2d 392, 404-05 (2000) (decision of which evidence to present in mitigation at capital sentencing was a matter of trial strategy); *People*

*v. Thompkins*, 191 Ill. 2d 438, 469 (2000) (noting that generally "courts are highly deferential in reviewing counsel's strategic decisions whether to present certain mitigating evidence"). For a defendant, "[t]his is a high bar to clear since matters of trial strategy are generally immune from claims of ineffective assistance of counsel." *People v. Dupree*, 2018 IL 122307, ¶ 44. Even if a defendant can clear this "high bar," prejudice must still be established to show that counsel was so deficient that the representation resulted in the deprivation of a fair sentencing hearing. *Id.*

¶ 99        The relevant factor in mitigation is found in section 5-5-3.1(a)(15) of the Code (730 ILCS 5/5-5-3.1(a)(15) (West 2016)), which states:

> "At the time of the offense, the defendant is or had been the victim of domestic violence and the effects of the domestic violence tended to excuse or justify the defendant's criminal conduct. As used in this paragraph (15), 'domestic violence' means abuse as defined in Section 103 of the Illinois Domestic Violence Act of 1986."

¶ 100       The obvious defect with this allegation as asserted in the petition is that defendant was sentenced in October 2004, and the statute setting forth factors in mitigation was not amended to specifically include domestic violence until 2016. See Pub. Act 99-384 § 5 (eff. Jan. 1, 2016) (adding 730 ILCS 5/5-5-3.1(a)(15)).

¶ 101       This may not be fatal to defendant's allegations. Even though domestic violence was not specifically articulated as a mitigating factor at the time of her sentencing, the additional evidence of Buchanan's violence against defendant could have been considered by the sentencing court under the scheme in force at the time. Pursuant to sections 5-5-3.1(a)(4) and (5) of the Code (730 ILCS 5/5-5-3.1(a)(4), (a)(5) (West 2004)), the court could consider whether "[t]here were substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing

to establish a defense," and whether "[t]he defendant's criminal conduct was induced or facilitated by someone other than the defendant." See *People v. Csaszar*, 375 Ill. App. 3d 929, 948 (2007) (noting that a sentencing court may consider nonstatutory factors in mitigation). Plea counsel argued at the sentencing hearing that section 5-5-3.1(a)(5) applied.

¶ 102    As explained above, plea counsel developed numerous witnesses who could have given testimony about Buchanan's physical abuse. However, defendant spends the majority of her opening brief reiterating portions of her own affidavit that was attached to the postconviction petition detailing the abuse. On this point, she alleges that plea counsel was ineffective for failing to call her to testify at the sentencing hearing. We reject this argument as the sentencing court was exceedingly clear with defendant based on the following colloquy:

> "THE COURT: Ms. Lighthart, do you, do you wish to testify in this matter?
>
> THE DEFENDANT: No, ma'am.
>
> THE COURT: You understand that you have the right to testify? It's only your decision to make that or decision about whether or not you wish to testify, and nobody can promise you anything, nobody can make any threats or force against you, it's only your decision to make; you understand that?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And are you making this decision?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Has anybody said or done anything to you that would affect your decision?
>
> THE DEFENDANT: No.
>
> THE COURT: So you're making this decision freely and voluntarily?

THE DEFENDANT: Yes.

THE COURT: Your attorneys haven't told you that you cannot testify?

THE DEFENDANT: No.

THE COURT: And I don't say that because I believe these attorneys say that. It's many times the cases are back years later and they make these allegations against their attorneys, so I want to make sure I cover these questions now."

¶ 103    Plea counsel cannot be deemed ineffective based on defendant's affidavit where defendant declined to testify at the sentencing hearing. Defendant acknowledges that she was admonished about her right to testify, but she responds that the rules of evidence are relaxed at sentencing hearings and that the only requirement is that the proposed evidence is reliable and relevant; thus, she contends that plea counsel could have submitted her affidavit. See *People v. Jett*, 294 Ill. App. 3d 822, 830 (1998). Whether the sentencing court would have exercised its discretion to allow defendant to refuse to testify and instead submit an affidavit is speculative. See *People v. Hudson*, 157 Ill. 2d 401, 450 (1993) (noting the admission of evidence at a sentencing hearing "lies within the sound discretion of the sentencing judge"); *People v. Johnson*, 2021 IL 126291, ¶ 55 (noting prejudice cannot be based on speculation or conjecture). Given the speculative nature of this allegation, it cannot form the basis of a substantial showing of a constitutional violation that would entitle defendant to relief.

¶ 104    Defendant next points to Floyd's affidavit, but Floyd's proposed testimony is largely cumulative of the testimony that was heard at sentencing. The sentencing court heard testimony revealing that defendant had been beaten by Buchanan on multiple occasions. Both witnesses who testified at sentencing recounted their knowledge of an incident where defendant was pistol-whipped by Buchanan, and they both saw the severe injuries defendant had suffered.

Kellaney saw Buchanan strike defendant in the face and push her to the ground. Both witnesses identified defendant in a photograph that depicted severe bruising to defendant's face. Both witnesses testified that defendant was afraid of Buchanan, that he had made threats against defendant's family, and that Buchanan stalked and followed defendant. The additional testimony of Floyd would not have provided further mitigation, regardless of her familial relation.

¶ 105 Defendant points to comments by the sentencing court and argues the court may have weighed the factor in mitigation more heavily in defendant's favor if, as it relates to the relationship with Buchanan, the court had a "real feel for *** all of its dimensions." However, this comment is taken out of context when the entirety of the sentencing court's pronouncement is taken into consideration. The comment also falls well short of defendant's assertion that the "court admitted it did not receive a complete picture of the significant abuse [defendant] suffered at the hands of Buchanan nor the deep fear [defendant] was experiencing because of Buchanan." The court accepted the proposition that defendant was the victim of domestic violence at the hands of Buchanan. However, the court also recognized that defendant had the opportunity when Buchanan was absent *not* to lure the victim to a situation that led to his death. This is the type of finding that directly contradicts a compulsion defense. See *Scherzer*, 179 Ill. App. 3d at 645-46. Bluntly, the court found defendant was the but-for cause of the victim's death. The sentencing court further articulated:

> "I certainly do not find that you acted under strong provocation. Even though you have presented evidence of [Buchanan's] violent nature, I do not find that this violent nature was in a level of strong provocation to justify or excuse your behavior in any way. *** In fact, according to your witnesses, you had an order of protection at one time. Whether that's true or not, you certainly had the capacity to

put yourself in a safe position and to put your family in a safe position without participating in the murder of [the victim]. You chose not to take that route, and for that you'll be forever responsible.

I do not find that you acted under strong provocation. I do not find there are substantial grounds tending to excuse or justify your criminal conduct although failing to establish a defense.

I do not find that your criminal conduct was induced or facilitated by someone other than yourself. Even though your testimony, the testimony that I've heard has been, as I've stated, regarding the violent nature of your relationship with [Buchanan], I do not find that that is a factor in this particular incident. In fact, it appears that it's your information regarding [the victim] carrying around money and cocaine that you relayed to [Buchanan] that that facilitated or induced this offense."

These comments from the sentencing court do not show that additional evidence in mitigation on the topic of domestic abuse would create the probability of a different outcome.

¶ 106    Defendant's argument on this point is analogous to a claim of ineffective assistance of counsel for the failure to introduce additional impeachment evidence against a witness. In that scenario, we often refuse to reverse "on the possibility, not probability, that with a little bit more impeachment, the witness would have been found totally incredible." *People v. Douglas*, 2011 IL App (1st) 093188, ¶ 47. Similarly, here, defendant asks us to find that in the presence of additional domestic abuse evidence, the sentencing court would possibly weigh factors in mitigation more heavily in her favor. We decline to do so. See *People v. Burton*, 184 Ill. 2d 1, 34 (1998) (noting the mere existence of mitigating evidence does not preclude imposition of the maximum sentence).

¶ 107     Defendant also argues in a single sentence in the opening brief—without further elaboration in the reply brief—that plea counsel failed to "present any medical or psychological testimony to explain how [defendant's] history of abuse could have led to her participation in the crime." This claim is contradicted by the testimony of Peshek at the hearing on defendant's motion to withdraw her guilty plea, where she explained that she had retained an expert witness to interview defendant, and the resulting report was "ambivalent" regarding the application of the compulsion defense. Presumably, evidence of the same caliber would have applied in mitigation for domestic violence as well, had that factor in mitigation existed at the time. Peshek testified that, based on the underwhelming nature of the expert report, she had not determined whether she would have called the expert at trial and may have proceeded only with lay witness testimony to establish the defense. Peshek stated there were opinions in the expert testimony that would have actually rebutted the compulsion defense. Those opinions would have also negatively impacted the sentencing court's weighing of the relevant mitigating factor in force at the time. In light of plea counsel's testimony, it is apparent she considered using the expert testimony but declined to do so as a matter of trial strategy.

¶ 108     Accordingly, defendant failed to establish a substantial showing of a constitutional violation at the second stage.

¶ 109          D. Reasonable Assistance in Presenting Sentencing Claim

¶ 110     Finally, defendant argues that postconviction counsel was unreasonable in failing to properly amend defendant's claim that plea counsel was ineffective for failing to submit additional evidence of domestic abuse at sentencing. Defendant alleges that postconviction counsel should have attached the nine additional witness interviews and an affidavit from an expert witness.

¶ 111    As noted above, defendant is entitled to the reasonable assistance of postconviction counsel, and counsel must comply with Rule 651(c) in order to provide the mandated level of reasonable assistance. *Huff*, 2024 IL 128492, ¶ 22. The Act requires that "[t]he petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2022). The filing of a Rule 651(c) certificate creates the rebuttable presumption defendant received reasonable assistance. *People v. Smith*, 2022 IL 126940, ¶ 29. Whether counsel provided reasonable assistance is reviewed *de novo*. *People v. Frey*, 2024 IL 128644, ¶ 21.

¶ 112    Attached to the petition in this case were the affidavits of defendant, Floyd, Lori Lighthart, and William Lighthart. While counsel could have attached the other witness interviews that the State attached to its motion to dismiss, we do not find that the failure to do so rebuts the presumption of compliance with Rule 651(c). Counsel provided evidentiary support for the claim in the petition. As found above, the additional evidence was cumulative to what was already attached to the petition. That counsel could have provided additional cumulative evidence does not render his assistance unreasonable.

¶ 113    We also find disingenuous defendant's argument that postconviction counsel should have attached to the petition the report summarizing the interview of defendant's son. Plea counsel attempted to call the son at the sentencing hearing, but before testifying the child told the sentencing court he did not know the difference between the truth and a lie. The court exercised its discretion in declining to accept testimony from that witness and evidence as to what his testimony would have been does not alter the court's ruling.

¶ 114    Defendant also argues postconviction counsel should have included an affidavit from an expert. Defendant argues in her reply brief that the State has not "meaningfully" replied

to this argument and thereby has forfeited any argument to the contrary. In our *de novo* review, we find that the argument is sufficiently contested to avoid forfeiture.

¶ 115    "Rule 651's mandate requiring counsel to make necessary amendments is not limitless." *People v. Nelson*, 2016 IL App (4th) 140168, ¶ 16. This court has previously commented that "case law establishes counsel is 'under no obligation to actively search for sources outside the record that might support general claims raised in a post-conviction petition.' " *Id.* (quoting *People v. Johnson*, 154 Ill. 2d 227, 247 (1993)). In both *People v. Moore*, 189 Ill. 2d 521, 542 (2000), and *People v. Williams*, 186 Ill. 2d 55, 61 (1999), our supreme court has made clear that postconviction counsel is under no obligation to seek out expert testimony or engage in a "fishing expedition" for supporting evidence. Rather, it is defendant's responsibility to provide postconviction counsel with such information. *Moore*, 189 Ill. 2d at 543; *Williams*, 186 Ill. 2d at 61. The record in this case does not indicate that defendant provided such information to postconviction counsel and therefore does not rebut the presumption of reasonable assistance.

¶ 116    Further, as discussed above, domestic violence was not a stand-alone factor in mitigation when defendant was sentenced. Peshek testified that the testimony of her retained expert in some respects tended to rebut compulsion, a mitigation factor considered by the sentencing court. On this record, we cannot conclude that postconviction counsel was unreasonable for not attaching such an affidavit.

¶ 117                                III. CONCLUSION

¶ 118    For the reasons stated, we affirm the circuit court's judgment.

¶ 119    Affirmed.